Good morning, everyone. Before we begin, I want to publicly thank and acknowledge Justice Sandra Day O'Connor for graciously agreeing to sit with us, hear these cases, and help us out. The entire court appreciates that, and I know the entire legal community, and even beyond that, the city of Philadelphia appreciates your presence and your courtesies and your graciousness. Thank you. It's a pleasure to be in the Third Circuit. Thank you. It's a pleasure for the Third Circuit to have you, that's for sure. First matter is Ray versus Reed. Good morning, Your Honors, and I'm not going to be doing the argument. My name is Ezra Rosenberg from Deckert, and we wanted to thank the court for granting leave to permit Angela Briggs and Richard Slavin, who are Penn Law School students, to present the argument on behalf of Appellant today. Thank you very much. Good morning. May it please the court, my name is Angela Briggs, and I represent the appellant, Frederick T. Ray, on this matter. I'd like to reserve one and a half minutes for rebuttal. I will be addressing the first issue of exhaustion, and my colleague Richard Slavin will be addressing the second issue on the requirements of U.S.C. 1915B. Your exhaustion argument sounds a lot like futility, and the case law says that futility does not apply under the PLRA to excuse a failure to exhaust. Why aren't you basically arguing futility as opposed to something beyond that? This isn't a futility argument. We're essentially asserting that in this case, they actually did not allow my client to proceed through the grievance process. So based on the PLRA, that made the requirement unavailable to him. So if I can direct the court to the prison policy that I will be addressing on three reasons why the exhaustion requirement wasn't required in this case. The first is that the policy unambiguously does not require or even provide for an appeal of the award after an inmate has been denied the official inmate complaint form. Second, Mr. Ray exhausted the administrative process because he submitted at least four inmate request slips, specifically requiring... He submitted them to the grievance officer, I guess, but not to the warden. No, he submitted it to the grievance officer. And if I can direct the court to the policy found at Joint Appendix 31, I want to highlight two aspects of this policy. And based on the PLRA, the policy dictates... What is that noise? What is that? Your cell phone's buzzing? Why don't we stop our time while that's... Okay, we just took five seconds away from you. Why don't we give it five seconds back? Thank you, Your Honor. If I can point, again, the court to the prison policy, there are two important parts of this policy that I want to highlight. The first is that there's an inmate request slip and there's an official inmate complaint form. Now, the crux of this issue in this case is whether or not Mr. Way was required to appeal. And we submit that he was not required to appeal the denial of the official inmate complaint form. That appeal process is only attached to what is proceeding after the official inmate complaint form. You're saying if he... As I understand this policy, it's set up so that there can be a preliminary screening by the grievance officer to eliminate totally frivolous grievances from even getting into the system. That is correct. That's the inmate request slip. If you're right, then why doesn't it eliminate that process? You're saying that if the form is not given, that there should be some procedure in there for appealing the failure to give a form? Is that what you're arguing? I'm saying that the policy simply does not address what to do in the event that the inmate is denied that form. It simply addresses what to do after an inmate has gone through the official inmate complaint form and proceeded through an investigation. Isn't the obvious thing, then, to do is simply to write to the warden? Your client has previously written to the warden. Why couldn't he write to the warden now? If I can point, again, the court to JA 103, and there you will see that he wrote there that he has attempted previously to address the warden. He says specifically, I have mailed it in form of complaints to the warden who remains unresponsive. Are you telling us that on this record we can see that he appealed to the warden, or no? He's speaking that the slip is unclear, but what is clear is that he attempted one time previously to step outside of the bounds of the policy and was unsuccessful. But that was not in connection with this particular thing. No. So in this particular complaint, he did nothing to go to the warden about any failure. He did not because the policy specifically does not require that he does so. Yeah, but if he wants to get something done, isn't the way to do it simply to go to the warden? I think what he did do is he attempted to abide by the policy. He filed at least 15 inmate request slips. Playing games is what he's doing. Your Honor, I believe by filing 15 inmate request slips, and on two of those inmate request slips he specifically states that he's trying to exhaust pursuant to the PLRA. He says on four inmate request slips, please provide form. That information coupled with the fact that he previously had stepped outside of the bounds and wrote to the warden who remained unresponsive, he was left with nothing to do at that point. He was left to write to the warden. That was all that he was left with. But the policy in itself, the exhaustion requirement is based on the prison policy. And the crux of this issue is whether or not he was required to appeal. An appeal is only required after the inmate has received findings. And in this case, findings is only attached to what occurs after the official inmate complaint form. Findings in itself, even a simple Black's Law Book definition or Webster definition is that findings denotes a process, an investigation that has occurred. With the inmate request slip, there is simply a review. The grievance officer is just... Was it February 4th he sent a letter to the two deputy wardens and to the warden? Yes. And was that letter the thing that was immediately preceding to him saying in response he got a Save Your Ink memo? Yes. And then he went into court? No, there were several grievances that followed that afterwards. The grievances where he discussed the PLRA followed that as well. But he never appealed to the warden? He never appealed to the warden because it wasn't required for him to do and when he had previously, it was unsuccessful. But that's really the issue here, isn't it? Whether or not that was required? Right, right. That was required and it was not required. That's why we're supposed to decide whether he had to appeal to the warden, right? Yes. Isn't that right? Yes, Your Honor. And I submit that he wasn't required to appeal to the warden, not only because of the issues that I stated before. You saved some time for rebuttal, I believe? Yes. Okay. Just to conclude, Your Honor, that... We'll hear from you on rebuttal. Okay. Okay, thank you very much. Good morning. My police court, Thomas Abramson, representing Mr. Reed and Madonna in the Chester County Prison. There's no argument that the Chester County Prison has a grievance policy. There's no argument that Mr. Ray didn't know about it. There's no argument that Chester County took any affirmative action to prevent him from fully exhausting the policy available. Well, why isn't the Save Your Ink memo similar to the special circumstances that we have in Hemphill in the Second Circuit, in our case in Brown, which sets up an estoppel basically to preclude you from arguing exhaustion? Why isn't that response back equivalent to that? Because in the first case, that's addressing a complaint from 2003, and he's not telling Mr. Ray. Mr. Ray's already written to the warden. He's saying, stop pestering us, stop making repeated requests. We've given it to our attorneys. We're working on it. He's not... That Save Your Ink doesn't say, don't write to the warden. He's already written to the warden at that point. Well, Senator, the entire context of that memo, I believe, was we've received your communications. It's in the hand of our attorneys. Save Your Ink. Right. Stop pestering us, basically. We're working on it. And I think in Hemphill, they talk about special circumstances that would put a reasonable person in this person's position, would cause that person to believe that it would be useless to take any further action, which is why I asked Miss Briggs about the futility argument. Well, I would say this to you. If you look at this, it doesn't say, don't write to the warden. It doesn't say, don't file grievances. It says, Save Your Ink because we've gotten your submissions. We've given them to our attorney. It's being looked into. We'll get back to you. Stop writing over and over again saying, what's the status, what's the status. We're working on it. Our attorneys have. Did he ever get a grievance form? Pardon me? Did he ever in this series that we're talking about here, the two consolidated cases here, did he ever get a grievance form? Well, he never got what's called an official, he never got this, although he never got an official inmate complaint form. Yeah, I asked for that. I asked them to send it to me and they did. Why wouldn't they send that to him? Isn't that a simple enough thing to do? Well, if you look at the policy. Both sides are playing games. Now, if you look at the policy, that form is not always going to be utilized. For example. That's no answer to the question, if he asks for it, why not send it to him? Isn't that the simplest way? If you look at his grievance requests, he never identifies that form by name. It doesn't matter. Are you playing games too? You're not seriously suggesting that inmates should give you the specific Commonwealth of Pennsylvania form number for the form he needs to get? No, I'm just saying that he was never thwarted in his attempt to write to the warden. What I'm saying is... Why didn't they send him the form? They didn't believe it was necessary. They didn't, in one instance, they said, you know, you've already grieved this. Go upon sand, basically, is what they said.  That's a conclusion. Wait, wait, wait. What's a finding? That's a conclusion by the Grievance Office. Xavier Inc. is a finding? No. Where's the finding in this case? Well, here. On JA88, Mr. Ray, your request for grievance is denied. You removed your legal materials because you're misusing the legal materials. That's Captain Wilson's finding. When was that? That was January 29th of 04. Captain Wilson signed that. There's no reason Mr. Ray, in response to that, all he had to do was submit this document and write on the bottom, I appeal to the warden. But is that the document he's trying to get? No. Well, I don't know that he ever... But what is this document? You said submit this document. Now you're holding up a different form. What is this document that he had to submit? To appeal to the warden? Right. Anything. The form he needed to get to appeal the finding that you just gave. Complaint form. Anything. No, he doesn't need the complaint form to appeal to the warden. He didn't need any particular form. Just something that said, I appeal to you, warden. Right. He could have put it on a plain piece of paper and said, I appeal Captain Wilson's decision on January 29th, 04. I appeal to the warden. Puts it in the outbox on his block. And that goes to Captain Wilson and Captain Wilson's office. Why doesn't his letter suffice? What's that? Why doesn't his letter suffice? The letter he sent, the copy to the warden... Well, he should have... That's a different grievance. That's a completely different grievance than what he was raising in January of 04. So my question to him would be, why didn't you... You've got a different grievance procedure going. You've written to the warden before during the grievance procedure. Do it again. It's easy. Just write on a piece of paper. I, Fred Ray, appeal Captain Wilson's decision January 29th, 04 to the warden. Put it in the outbox. And that's the procedure even though it's not set in the policy. That's the procedure that the institution would expect the inmate to use if you ask for a grievance form, no form is tendered to the inmate in response to that request. You're saying that the expected behavior then or the expected response is you send a letter to the warden basically appealing the fact that you didn't get your grievance form? It's a very, very informal procedure. Well, where's that anywhere in this policy? What you just said was the policy. Where's that anywhere in this policy? If you don't get a form, the procedure is to then inform the warden you didn't get a form. It says that you can appeal any finding. It also says that you won't... That's not a finding. How do you appeal that? This is a finding. How do you appeal the decision of the grievance officer not to give you a form? If he can write on here... What's the here? Is that a form? He can put on an inmate request slip, I want the official form. If that's said denied, he can say I appeal that to the warden, give me the form. That's all he has to do. Okay, and what are you holding up? Is that the form you used to get? This is an inmate request slip. This is in the record. This is the form you used to get the grievance from the grievance officer. This is the first step to invoke the grievance process. He files this and says I have a grievance. Now... Did he file one of those? Yes, he filed 15 of these. So, what's missing? He should have written to the warden like the policy says. He should have said all he had to do, he could have written this on a blank form, he could have written on a piece of paper, he could have written on this form. I appeal to the warden. Give it to Captain Wilson. Captain Wilson is obligated to give that to the warden. He had done that before. Is that not correct? In 03, he indicates... I don't know if he can remember back to 03. I'm not sure. Yeah, at JA 103, which counsel cited, he says that he has written to the warden 12-4 of 03, and he wrote to the two deputy wardens... I'm sorry, I didn't hear the... December 4 of 03 at JA 103, he submits an inmate request slip, basically saying, what's going on with my complaint? And he indicates that he's written to the then warden John Masters, Deputy Warden McFadden, Deputy Warden Bresnan. Now, this all predates the January instance that caused him to file a complaint in the lower court. So, he wrote to them. So, apparently, he'd done it before. I don't know why he wouldn't do it again in January of 04. The policy that you're laying out here is... I'm looking at your policy now, from the inmate handbook, and what you're describing to me doesn't really seem to fit within the policy that is in that inmate handbook. Well, there's nothing in the... It's not that technical a process. There's nothing in the policy that says, if you don't submit Form B, you cannot appeal. Okay, and I was sick with Ms. Briggs. You've exhausted your time, too. I'll take another look at the policy, and maybe I'm missing something with it. Thank you. Thank you, Your Honor. The policy dictates that an inmate is required to appeal the finding. If you look at the policy, the word finding is replaced after an investigative process has occurred. That process is only occurring after the inmate has received the official inmate complaint form from the grievance officer. There is nothing at all in the policy that says that he should informally write somewhere on an inmate request slip that he wants to appeal. What the policy does say, however, is that he will provide an inmate request slip. The grievance officer, if he wants to proceed, will provide him with an official inmate complaint form. On the sixth sentence, it says, after which the grievance officer will investigate, after which he will furnish with you a written explanation. After that, receives its findings. So their findings is only attached to the official inmate complaint form. If the prison, if it was the prison's intention for him to be able to deny, to appeal the denial of request slip, they could have simply stated that after the third sentence. He's right. This is not a difficult thing. They could have simply said, after the denial of an inmate request slip, you have the right to appeal. You have the requirement to appeal. They did not say that. If they did, we wouldn't be here today. I didn't get the feeling until this argument that there was any provision in there to appeal the denial of the request slip. I'm sorry, can you repeat that? I didn't get the feeling until this discussion that there was any provision in the policy to deny the decision to not give the inmate a grievance form. I don't see that in the policy. Correct, Your Honor. It's completely absent. Okay. Thank you, Ms. Briggs. Thank you. Good morning, Your Honors. May it please the Court. My name is Richard Slavin. I represent the appellant, Frederick Ray, on the statutory interpretation issue. I'd like to reserve a minute and a half for rebuttal. Okay. The issue today is the proper taxation for court costs for a prisoner litigant under 28 U.S. Code 1915b when that prisoner has brought multiple actions or appeals. I'd like to move to the language of the statute, which appears on page 35 of our brief. I want to focus on both the language and the purpose behind the statute, both of which compel this Court to adopt the per-prisoner approach to filing fees. The per-prisoner approach would cap the month-to-month payments for the prisoner litigant at 20% of his monthly income, regardless of the number of actions or appeals pending. And where do you see that in the text of the statute? How do you read this language to get the per-prisoner cap? 1915b-2, Your Honor, says, after payment of the initial partial filing fee, the prisoner shall be required to make monthly payments of 20% of the preceding month's income credited to the prisoner's account. We ask, Your Honors, to use this word, shall, here, as we said, a discretionless obligation to mean that only 20% of the inmate's account can be garnished. That's not what it says, though. You slip the word only in there that Congress didn't provide. You help Congress out a little bit, and you put a limiting adverb that they didn't see fit to put in there. Well, Your Honor, the government's position is that the statute should say, for each case pending, and that's not what the statute says either. I agree. I'm not sure what the statute says. So in that case, what do we do to figure out what Congress intended? Okay. In answering that, how does 1915, I think it's G, the provision, the three strikes and you're out provision, and I'll ask both sides this question. How, if at all, does that provision factor into our interpretation of the 20%? When it comes to congressional intent, there is the argument. I'm sorry. I just laughed at the thought. Go ahead. The purpose behind the PLRA was indeed deterring prisoners from filing frivolous actions, and to do that, Congress believed that making prisoners pay the full amount of the filing fee as well as creating this specter of the three strikes rule would discourage prisoners from filing frivolous litigation. If we adopt your interpretation, as I think was the Second Circuit said, basically, after the first filing, you get a free ride. You can file as many complaints after that as you want to because your cost will be kept at 20%. Well, that is the month-to-month payment of fees. There's also the initial partial filing fee, which at the commencement of each action, the prisoner will have to pay 20% of his inmate account, and moreover, 1915b1 makes clear that in no circumstance will the prisoner not pay the full amount of the filing fee. The question here is one of timing. Are there any objective records as to how much prisoners have in their accounts? Not that I have. In the record below, Mr. Ray's inmate account has varied, and it's... From what to what? I don't recall the lower end. The higher end was around $100. What's the practice in the other circuits on the per case fee? So the Second and the Fourth Circuit are the two circuits which have adopted the... Excuse me. The Second and the Fourth Circuits have adopted the per prisoner approach. The Fifth, Seventh, Eighth, and Tenth have adopted the per case fee. I believe that it is... If a prisoner has two actions or appeals pending, then that would be 40% of his account, the income to his account. If it's three cases, it's 60%. And why isn't that consistent with what you said earlier was the policy behind the statute? Because... At no point in the statute does Congress specify a number higher than 20%. It simply says he will pay 20% of his income to get into court. I don't know how that helps you because they could have said more, they could have said less. The issue is 20% based on what? Based upon a single person filing or based upon each filing the single person makes? 20% just seems to me like an arbitrary number that they came up with. It may very well have been, but they could have tried to exact a much larger pound of flesh than the 20%, but they didn't do that. And we don't know why they picked 20%, but... But the more logical approach is just to apply it to each time the prisoner files. And that's kind of how it reads. I don't know why you'd want to stretch things and say there's a one-time limit. There's some benefit to be obtained by encouraging prisoners to lump everything in the first filing and not think they can come in week after week with a new one and pay nothing more. Your Honor, there is the initial partial filing fee. So when prisoners commence their action, they're already paying 20% of their inmate account. Well, they ought to pay it every time they come in is how I read the statute. They do pay the initial partial filing fee each time they come in. At issue is the month-to-month payments. Well, that follows the initial fee, doesn't it, for each case? There are different purposes, Your Honor, behind the initial partial filing fee and the month-to-month fee. The initial partial filing fee is about making the prisoner stop and think before filing a frivolous action, whereas the month-to-month fee is about paying the total fees that they've incurred. I see that I am out of time, if Your Honor has any questions. Well, you weren't quite out of time, but you are now. Thank you. Nice job, Mr. Slaven. May it please the Court, Brian Goldman for the United States. Section 1915 governs an individual court's authority to allow an individual litigant to proceed IFP in an individual case. The statute has always operated on a per-case basis, and Congress did nothing to Well, but not in all surrogates, though, has it? The Second Circuit doesn't do it that way. Prior to 1996, when Subsection B was added, the statute has always operated on a per-case basis, and my point is simply that Congress did nothing to alter the per-case operation of the statute when it added Subsection B in 1996. Why does the State not follow the United States on this? I think it's a little strange that the State doesn't follow your analysis of this statute. I'm sorry, I'm not sure how you Am I not correct? I shouldn't put it that way. The State hasn't followed the United States' position on this, right? In what respect, Your Honor? It just doesn't agree, does it? I'm not aware of the State having a position on this, and I apologize if I'm missing something there. I'm not aware of it either. I hope you'll file something with this Court to indicate what the different States' positions are on it, if they differ from the U.S. You can do a 28-J with a copy to your opposing counsel. Certainly, I'm not aware of what Well, you can do the research, Your Honor. Yes, yes, absolutely, absolutely, Your Honor, certainly. How would you answer the question that I asked Mr. Slavin, the interplay between 19 and 15-G in this section, because it seems like the three-strikes rule accomplishes the policy that you're arguing in asking us to interpret this on a per-person basis. And if that's true, why would they do it both ways? Why would they set up a three-strikes rule in 1915-G to limit the number of frivolous appeals and then intend to draft this fee statute in such a way as to limit the number of frivolous appeals? Well, Chief Judge McKee, I believe that there are two different ways to accomplish the same purpose, which is to discourage filing legally insufficient suits while not attempting to deter the filing of potentially meritorious suits. One way to do that is to put in place a filtering mechanism based on economic incentives, which is what subsection B does. The other is to put in place a special provision for prisoners who, over a period of time, have run afoul of the policy to deter suits that were insufficient. Because that's going to have a showing effect on any lawsuit, not just frivolous suits. If an inmate has a suit that he or she believes to be meritorious, the fact of the looming filing fees hanging overhead is going to chill the filing of that suit, no matter how meritorious he or she may think it is. And on the other hand, you've got this subsection G over there, so that if it's clearly frivolous, if it's the kind of suit where it's clear that the inmate's playing games, the inmate's going to know, if I file more of those suits, it's going to put a notch up on the totem and I'm going to sooner or later run out of the ability to file a suit. So when I get to the day when I really do have a legal complaint, I'm not going to be able to bring it to court. Well, I disagree that it has a chilling effect in a manner other than the chilling effect, than the deterrent effect, I should say, that Congress intended, which was to recalibrate the incentives, because Congress had found that the incentives were misaligned prior to the PLRA. And so Congress wanted to recalibrate those incentives in order to discourage the filing of legally insufficient suits. So if prisoners, if because of these new economic incentives, prisoners choose not to bring suits that are insufficient, then that is the policy working. Yeah, but if you put in the word that are insufficient, because they may also, in my hypothetical, that's not the only kind of suit they would decide not to bring. They may decide not to bring suits that the entire criminal justice system may be better off if they were adjudicated. Well, I suppose that by design, any system of incentives operates on the entire class of potential suits, because there's no way to know up front whether a suit is going to be meritorious or not. So the idea is you put in place a screening mechanism that sets the incentives so that only those litigants with potentially meritorious suits will choose to go forward. And it moves that choice to the litigant to actually take a look at the merits of the potential suit and make a decision in Congress's terms of whether the suit is worth the price. And so if I could just turn back to the text of the statute. Appellant acknowledges that subsection B1 applies on a per case basis, which means that each time a prisoner files a new action or appeal, he must make an initial partial filing fee payment. Well, then subsection B2 must apply per case as well, because the payment of that initial partial filing fee is the only triggering condition in the statute for the monthly payments that follow. And it doesn't matter what other payments a prisoner might be making simultaneously, because the statute simply makes no reference to those other payments. Well, B2 talks about, and I find this puzzling, they talk about the preceding month's income credited to the prisoner's account. They can't possibly have meant income, because these accounts, they technically earn income, I would assume, but the income is absolutely de minimis. The income that an account of the value of $100 or $10 or $15 would have is negligible. Well, it's an amount that's calibrated to the prisoner's individual financial condition. So rather than impose an absolute amount, Congress did indeed mean to base the amount of the monthly payment for each prisoner as a percentage of that prisoner's income for each case. And in answer to Judge Sloviter's earlier question... You're saying it's the prisoner's income, not the account's income. That's what you're saying. Yes, Your Honor, the amount credited to the prisoner's account. Were there any questions? Well, he was about to say something about the question. If I may, Your Honor, I was just going to answer Judge Sloviter's question about the actual amounts that we're discussing here. So in the Bureau of Prisons system, I can't speak to the county system particularly, but in the Bureau of Prisons, the median inmate has an average balance of around $50, and the median inmate's monthly income is around $25. So we're talking about $5 a month in terms of 20% of that income and around $10 for the initial partial filing fee. Thank you. Thank you. Did you also, Ezra? Did you also, Ezra, have time? I don't recall if you did or not. Okay. Chief Judge McKee, going back to your point about the three-strikes rule, it does exist to deter frivolous suits, and as a prisoner contemplates filing an action, he has to stop and think about, is this frivolous? Am I going to get a strike against me? If I have two strikes, am I going to be completely thrown out of informal papyrus? And then there's a 20% cap month-to-month. That allows for a reasonable method of payment over time while still allowing prisoners to have an inmate account. And as I said, we don't know why Congress chose 20%, but they clearly wanted inmates to have some money left over at the end of their filing suits. But no matter which interpretation is correct, there's a flow of $10. There will be some money left in this account no matter which provision, which reading is correct. Your Honor, it says that the 1915b-2, which you're referring to, the second sentence, says that the agency having custody of the prisoner shall forward payments from the prisoner's account to the clerk of the court each time the amount in the account exceeds $10 until filing fees are paid. Right, so once it's $10 below, they don't debit the account under subsection 2. It's only $10.01, and then they can take a deduction. Yes, Your Honor. And potentially, however, if it's $10.01 and the prisoner has two or three actions, that would be 40% or 60% of the $10, which goes down to... I don't understand the math for that, but... 60%? Your Honor, 60%... Well, I mean, you still can't go below $10, right? It says that the payment shall be forwarded each time the amount in the account exceeds $10, not down to $10. Well... Okay, thank you very much. Thank you. We'll take the matter into advisement. We thank counsel and soon-to-be counsel for a very, very helpful argument. Thank you.